IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MAY 1996 SESSION

FILED

May 30, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| GREGORY THOMPSON, | * | C.C.A. # 01C01-9506-CC-00180 |
| Appellant, | * | COFFEE COUNTY |
| VS. | * | Hon. William S. Russell, Judge |
| STATE OF TENNESSEE, | * | (Post-Conviction, Death Penalty) |
| Appellee. | * | |

For Appellant:

Robert J. Warner
Boult, Cummings, Conners, & Berry
414 Union Street, Ste. 1600
P.O. Box 198062
Nashville, TN 37219

Joseph E. Ford
McBee & Ford
17 S. College Street
Winchester, TN 37398

For Appellee:

Charles W. Burson
Attorney General & Reporter

Kimberly A. Chance
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

C. Michael Layne
District Attorney General
307 S. Woodland
P.O. Box 147
Manchester, TN 37355

Stephen Weitzman
Asst. District Attorney General
307 S. Woodland
P.O. Box 147
Manchester, TN 37355

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

The petitioner, Gregory Thompson, appeals the trial court's denial of post-conviction relief. The petitioner was convicted of first degree murder. The jury sentenced the petitioner to death based upon three aggravating circumstances: (1) that the murder was heinous, atrocious or cruel in that it involved torture or depravity of mind; (2) that the murder was committed to avoid prosecution; and (3) that the murder was committed while the defendant was committing a robbery or kidnapping. Tenn. Code Ann. § 39-2-203(i)(5), (6), and (7) (repealed 1989). Our supreme court affirmed the conviction and sentence on February 27, 1989. State v. Thompson, 768 S.W.2d 239 (Tenn. 1989). In 1990, the petitioner filed this petition for post-conviction relief. At the conclusion of an evidentiary hearing several years later, the trial court denied the claim.

In this appeal of right, the petitioner presents the following issues for our review:

> (1) whether the post-conviction court erred by finding that the petitioner received the effective assistance of counsel;
>
> (2) whether the post-conviction court erred by denying funding for a psychologist or psychiatrist and an investigator;
>
> (3) whether the post-conviction court erred by refusing to set aside the order designating Judge William Russell to hear this case and in refusing to reinstate Judge Buddy D. Perry;
>
> (4) whether erroneous jury instructions defining deliberation and premeditation require reversal;
>
> (5) whether the jury instructions on the "heinous, atrocious or cruel" aggravating circumstance were unconstitutionally vague;
>
> (6) whether the petitioner's confession was unlawfully obtained and illegally admitted at his trial;
>
> (7) whether the failure of the trial court to instruct the jury

2

on the effect of non-unanimity and the option to recommend life imprisonment violated the petitioner's rights under the Eighth and Fourteenth Amendments;

(8)  whether the trial court's allowing Dr. Watson to testify and introduce psychiatric/psychological reports through his testimony was an unconstitutional denial of petitioner's rights;

(9)  whether the petitioner was denied his constitutional right to a trial by jury by the exclusion of two prospective jurors; and

(10)  whether the petitioner's constitutional rights were violated by implicit references to his failure to testify.

We find no merit in the first four issues.  We conclude that issues five, six, seven, and eight were previously determined by our supreme court on direct appeal and that issues nine and ten are waived.  Accordingly, we affirm the judgment of the trial court.

A brief review of the convicting evidence is helpful.  On January 1, 1985, the petitioner and Joanne McNamara, a juvenile, kidnapped the victim, Brenda Lane, in a Wal-Mart parking lot in Shelbyville, Tennessee.  He forced the victim to drive them to an isolated area outside Manchester, Tennessee, where, he stabbed her four times in the back and then abandoned her.  After his arrest, the petitioner confessed to the crime and assisted authorities in locating the body.  His confession was introduced as evidence during the trial.

At the penalty phase of the trial, several witnesses testified on behalf of the petitioner.  He was described as a well-behaved, good student prior to leaving home in 1979.  The defendant's girlfriend, Arlene Cajulao, testified about his life after he left home, when he was in the military service and stationed in Hawaii.  Dr. George Copple, a clinical psychologist, testified about the general abilities of the

3

petitioner and what kinds of work he could perform during his imprisonment. Dr. Robert Watson testified that the petitioner exhibited anti-social adult behavior, was not remorseful, and malingered mental illness. A more complete account of the evidence appears in Thompson, 768 S.W.2d at 243.

I

The petitioner first argues that his two trial attorneys performed their duties ineffectively. In this appeal, the state contends that this ground for relief is barred as having been previously determined. During the course of the evidentiary hearing, however, the petitioner was allowed to introduce proof that his trial counsel was ineffective; at that time, the state did not assert the defense of previous determination, Tenn. Code Ann. § 40-30-112 (repealed 1995), and made no objections to the admission of the testimony.

In the direct appeal from the conviction and sentence, the petitioner made two separate claims regarding his trial counsel:

> Issue I: The constitutional rights of the defendant, pursuant to Article I, Sections 8 and 9 of the Declaration of Rights, Tennessee Constitution, and under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution were denied defendant by virtue of the appointments of attorneys John W. Rollins and H. Thomas Parsons, when they were disqualified to act as counsel due to their respective representations of Coffee County and Sheriff Bobby McCullough, sheriff of Coffee County.

> Issue II: The rights of the defendant, Gregory Thompson, to competent counsel pursuant to Article I, Sections 8 and 9 of the Declaration of Rights of the Tennessee Constitution and under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were denied him by the failure of the court to appoint counsel experienced in both criminal litigation and death litigation, neither Doyle E. Richardson nor H. Thomas Parsons having ever participated in a death penalty case.

4

In resolving the first claim, our supreme court ruled as follows:

> Plainly, an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest. To establish a denial of the sixth amendment right to counsel, it is sufficient to show that an actual conflict existed. If an attorney actively represents conflicting interests, no analysis of prejudice is necessary; it is presumed that his divided interests adversely affected his representation. But as counsel conceded, the conflict claimed here was only a potential one and quite remote; and it was resolved before trial. Without a showing of prejudice--and an attorney's good faith assertion of his disqualification is not in itself ineffective representation--there is no denial of counsel.

Thompson, 768 S.W.2d at 245 (citations omitted).

As to the second issue, our supreme court ruled as follows:

> Neither is any prejudice apparent in this record from counsel's lack of experience in capital cases or from co-counsel Rollins' non-participation or from inadequate compensation to Defendant's court-appointed attorneys. While it is understandable that counsel would second-guess their decisions in a case such as this, these and related questions are more appropriately raised by other counsel when the present attorneys are relieved of their advocacy role.

Thompson, 768 S.W.2d at 245 (footnote omitted) (emphasis added).

The state argues that our supreme court has already determined the petitioner received the effective assistance of counsel. "A ground for relief is 'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-112(a)(1) (repealed 1995). Ineffective assistance of counsel is generally "'a single ground for relief'" under the post-conviction statute. Cone v. State, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995), app. denied, (Tenn. 1996), cert. denied, _____ U.S. _____, 117 S.Ct. 309 (1996). "'[T]he fact that such violation may be proved by multiple acts or omissions

5

does not change the fact that there remains only one ground for relief.'" Frank McCray v. State, No. 01C01-9108-CR-00255, slip op. at 10 (Tenn. Crim. App., at Nashville, Sept. 11, 1992) (quoting William Edward Blake v. State, No. 1326, slip op. at 3 (Tenn. Crim. App., at Knoxville, March 19, 1991)). A petitioner may not relitigate previously determined grounds for relief by presenting additional factual allegations. Cone, 927 S.W.2d at 581-82.

Here, our supreme court clearly ruled on the first issue, holding that a conflict of interest did not deprive the petitioner of the effective assistance of counsel. Thompson, 768 S.W.2d at 245. While observing that the conflict issue was "thoroughly litigated in the trial court," our supreme court pretermitted consideration of the additional factual allegations in support of the claim of ineffective assistance. Id. The court ruled that "these and related questions are more appropriately raised by other counsel when the present attorneys are relieved of their advocacy role." Id.

It is true that ineffective assistance is a single ground for relief and a petitioner may not relitigate the issue by presenting new and different factual allegations in a subsequent proceeding. In this instance, however, our supreme court has deliberately abstained from ruling on whether some of the factual allegations entitle the petitioner to relief. Thus, those additional allegations should not be considered as previously determined. Except for the allegation that his counsel was ineffective for laboring under a direct conflict of interest, we must conclude that the issue has not been previously determined.

Nevertheless, raising the issue of ineffective assistance on direct appeal is a "practice fraught with peril." State v. Jimmy L. Sluder, No. 1236, slip op.

6

at 16 (Tenn. Crim. App., at Knoxville, Mar. 14, 1990).  In Sluder, our court, in order "to prevent the appellant from being prejudiced due to counsel's ill-advised attempt to raise this issue, [held] that the appellant may raise this issue in a proceeding brought pursuant to the Post-Conviction Procedure Act."  Id. (footnote omitted).  An appellant runs the risk of having the issue resolved "without an evidentiary hearing which, if held, might be the only way that harm could be shown--a prerequisite for relief in ineffective trial counsel claims."  Jimmy Wayne Wilson v. State, No. 909, slip op. at 10 (Tenn. Crim. App., at Knoxville, May 29, 1991).  The supreme court's recognition of these risks may have been the basis for their refusal to consider the full issue.

The petitioner argues that his trial counsel was ineffective for the following reasons:

> (a)  by failing to object to hearsay testimony at the hearing on the motion to suppress the confession;
>
> (b)  by failing to interview witnesses who could have been beneficial to the petitioner's case, especially at the penalty phase;
>
> (c)  by failing to adequately investigate prior head injuries to the petitioner;
>
> (d)  by failing to adequately prepare for cross-examination of the state's witnesses;
>
> (e)  by failing to prepare and present defense witnesses;
>
> (f)  by "opening the door" to damaging evidence during the penalty phase of the trial;
>
> (g)  by waiving during the penalty phase the right to confront the state's expert witness when a deposition was used in substitution of the appearance of a witness;
>
> (h) by failing to question the assistant district attorney at the motion for new trial about possible racist remarks, which would have been useful in establishing a Batson violation; and
>
> (i)  by failing to object to comments by the state upon his

7

failure to testify.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advise given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Recently, our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

Moreover, in claims of ineffective counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); See State v. Martin, 627 S.W.2d 139, 142-43 (Tenn. Crim. App. 1981). Such deference to tactical decisions of counsel applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Finally, on appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record

8

preponderates against them.  Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988).  The burden is on the petitioner to show that the evidence preponderates against those findings.  Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

(a)

The petitioner argues counsel was ineffective for failing to object to hearsay testimony at the hearing on the motion to suppress the petitioner's confession.  On direct appeal, our supreme court summarized the facts surrounding the defendant's confession:

> Thompson was arrested on January 2 in Marietta, Georgia, and transported to the local police department. He was advised of his rights, and made an initial admission to an agent of the Tennessee Bureau of Investigation that he had been in Shelbyville and bought the vehicle found on fire.
>
> It is undisputed that Defendant then invoked his right to counsel and all questioning ceased.  T.B.I. Officer Eubank[s] then consulted with a local detective about securing counsel, and Detective Parker called, in turn, a judge and District Attorney General Tom Charron. General Charron came to the department and introduced himself to Defendant at 11:30 p.m.  According to his testimony, he understood that Thompson had asked to see him.  He identified himself as a prosecutor and repeatedly advised Defendant of his right not to speak. He explained that counsel would be appointed at arraignment at eight o'clock in the morning.
>
> ... At 1:15 a.m., as he admitted in the hearing, Thompson asked to speak to this attorney again. Attorney General Charron re-entered the room, identified himself again, but did not give new "Miranda" warnings. Thompson then, and later, confessed to the kidnapping-stabbing and drew a map to the scene.  His statements, the map, and resulting evidence were introduced at trial.

Thompson, 768 S.W.2d at 247.

As stated in the petitioner's brief, "[t]he basi[c] issue at the hearing was

whether [he] had reinstituted talking to the authorities after having requested an attorney." At the suppression hearing, T.B.I. Agent Jerry Eubanks testified as follows: "I remember Detective Graham coming out of the interview room and telling the Attorney General that Gregory Thompson wanted to talk with him." See State v. Crump, 834 S.W.2d 265, 268-69 (Tenn. 1992). The petitioner specifically argues his counsel was ineffective for failing to object to the admission of this hearsay evidence.

In our view, the petitioner has failed to demonstrate any prejudice from the failure to object to the hearsay. See Goad, 938 S.W.2d at 370. Our review of the transcript establishes that the petitioner actually admitted during the suppression hearing that he wanted to talk to the District Attorney again. When asked on cross-examination, "Finally, you told that Detective Graham ... that you wanted to see that lawyer [the District Attorney] again," the petitioner responded affirmatively. Also, the following exchange occurred during cross-examination:

> Assistant Attorney General: Then you tell Graham that you want to talk to him again, didn't you?
>
> Petitioner: Yes, sir, after he came in.
>
> Assistant Attorney General: You told somebody, at least, I say Graham ... you told him that you wanted to talk to that district attorney?
>
> Petitioner: Yes.

The petitioner acknowledged that he reinitiated contact with the District Attorney. The hearsay evidence at issue was not necessary to establish that as fact. Thus, there has been no showing of prejudice. Id.

(b)

The petitioner argues that his trial counsel was ineffective for failing to interview witnesses who could have been beneficial to his case, especially during

10

the penalty phase. Although not fully articulated, the petitioner's brief suggests that the witnesses could have been useful to show that head injuries might have contributed to his commission of the offense. The petitioner specifically complains about the failure to interview his step-father, his attorney in the military, the mother of his co-defendant, a witness who worked with the petitioner after his head injuries, a woman who lived in the residence where the arrest was made, and an employee at the Middle Tennessee Mental Health Institute (MTMHI).

When the claim of ineffectiveness is predicated upon the failure to present potential witnesses, their testimony should be offered at the post-conviction hearing. In this manner the court can consider whether (a) a material witness existed and could have been discovered but for counsel's neglect, (b) a known witness was not interviewed by counsel, (c) the failure to discover or interview a witness prejudiced the petitioner, or (d) the failure to call certain witnesses denied critical evidence to the prejudice of the petitioner. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Here, because none of the witnesses testified at the hearing, the petitioner was simply unable to show prejudice. We cannot speculate upon the usefulness of these witnesses without the information they could have provided. Id.

(c)

The petitioner next argues that trial counsel was ineffective for failing to investigate head injuries he had incurred well before the trial. The petitioner contends that he had been hospitalized twice for injuries and the failure to produce evidence of that at trial qualifies as ineffective assistance.

The trial judge made the following findings on this issue:

11

> 1. Defense counsel made an adequate investigation of their client's background and prior medical history. Present counsel presented no proof of mental problems on the part of Mr. Thompson that would have been a defense to the charge, or that would constitute a shield against execution.

> 2. Counsel did not seek expert and investigative assistance regarding alleged head injuries to Mr. Thompson during his youth, or to testify as to his incompetency at the time of his confession because the facts and circumstances did not indicate the necessity for such action.

Defense Attorney Parsons testified that he knew about the head injuries the petitioner sustained, "one in a car wreck when he was young and ... another as a result of an assault in the military." While he acknowledged that he "probably" did not put these facts before the jury, Attorney Parsons claimed that he was aware of the possible "significance" of the injuries but did not get all of the medical records. He commented that testing by MTMHI also did not suggest brain damage. Attorney Richardson concluded that he was not "as thorough as [he] should have been" but contended that the testing by Dr. Copple and MTMHI did not reflect "brain damage." Attorney Richardson also testified as follows:

> [We d]id try to hire a psychiatrist but that was not successful and it was... the type thing it was a theory as to whether to go with his good character and reservoir of moral upbringing, a man with a great deal of ability that could be used in the penitentiary and a life sentencing. I doubt if there will ever be another man on death row that had as good a background as he did. I don't know of any, and then the question as to whether to mix into that or try to accentuate some brain damage that we hadn't been able to spot, but at the same time, probably with some more digging may[be] could have and then give the jury the idea that this man, if he ever gets out of prison with some brain damage, he will kill ... somebody else, that is kind of counter productive. We went with one strategy and probably if we had to do it over again, would go with the other strategy because that one didn't work.

Dr. Gillian Blair, a clinical psychologist, who reviewed the petitioner's

12

medical records before and after his incarceration and read the reports from MTMHI, conducted a basic psychological battery and neuropsychological tests. At the time of the evidentiary hearing in 1995, she had not interviewed the petitioner in three years. Since his incarceration for this crime, however, the petitioner had been diagnosed with bipolar disorder, schizo affective disorder, or schizophrenia. It was Dr. Blair's opinion that in order to determine whether the petitioner's medical condition could have affected his behavior at the time of the murder, more testing and background investigation would need to be conducted. She specifically testified that she could not give an opinion on the petitioner's mental condition at either the time of the murder or the time of the evidentiary hearing.

"[T]here is a 'greater duty of inquiry into [a] client's mental health imposed for [the] penalty phase of [a capital] trial.'" Cooper v. State, 847 S.W.2d 521, 529 (Tenn. Crim. App. 1992) (quoting Bertolotti v. Dugger, 883 F.2d 1503, 1516 (11th Cir. 1989)) (second and third alterations in original). Even if a psychologically based defense could not be supported at the guilt phase, the evidence may be useful in mitigation at the sentencing phase. Id. Even when court-ordered examinations result in a finding of sanity, defense counsel should always attempt to determine whether psychological infirmities may be used as mitigating evidence. Id.

Having determined there is a duty to investigate whether any psychological impairments might qualify as mitigating evidence, we nonetheless conclude that the petitioner has failed to demonstrate any prejudice from the failure of trial counsel to further investigate the head injuries. The petitioner has failed to establish that the head injuries had any effect upon his mental stability at the time of the murder. Further, he has failed to establish that any type of psychological

13

impairment in general may have existed which would have been mitigating evidence. Because Dr. Blair declined to give an opinion on these important issues, the evidence does not preponderate against the trial court's finding that the defense attorneys were not ineffective.

The decision not to further pursue the head injuries in the penalty phase of the trial also qualified as a reasonable strategy. Trial counsel's decision to emphasize the petitioner's positive qualities rather than to suggest brain damage, while unsuccessful, was based upon adequate investigation. "[T]he fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper, 847 S.W.2d at 528. Deference must be given to an informed trial strategy. This court must refrain from second-guessing trial counsel's decision to emphasize the petitioner's positive attributes rather than possible brain damage. Because two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion.

(d)

The petitioner also alleges his counsel was ineffective for failing to adequately prepare to cross-examine the state's witnesses. His chief complaint is that Attorney Parsons was ineffective in his cross-examination of Dr. Charles Harlan, then the State Medical Examiner.

At trial, Dr. Harlan testified that the victim died from the stab wounds. He believed that she lived for five to ten minutes after sustaining the wounds and would have been conscious for part of that time. Attorney Parsons, who cross-examined Harlan acknowledged that he had not interviewed Harlan prior to trial and

14

conceded his surprise that the state utilized the pathologist to prove premeditation and deliberation.

Again, however, the petitioner has not demonstrated that any deficiency in the cross-examination of Dr. Harlan affected the outcome of the trial. The evidence of guilt, including the elements of premeditation and deliberation, was overwhelmingly established through the other witnesses. In our view, any failure to more effectively cross-examine Harlan had no effect on the outcome of the trial. Thus, the petitioner has failed to show prejudice. See Goad, 938 S.W.2d at 370.

(e)

The petitioner next argues that his trial counsel ineffectively prepared the defense witnesses for trial. He specifically complains that his then girlfriend Arlene Cajulao was not properly prepared to testify. During the penalty phase of the trial, Ms. Cajulao testified that she met the petitioner while he was stationed in the military in Hawaii, where they became romantically involved. She related that her family was fond of the petitioner and that he was good with the children in her family. She recalled that the petitioner was assaulted by three "guys" who struck him on the head with a crowbar. She related that the petitioner, who had unsuccessfully sought to have his attackers disciplined by the military, became very paranoid after the assault. She also testified that the petitioner had been court-martialed for dislocating an officer's shoulder in a pushing incident.

During her cross-examination, the state utilized military records to establish that the petitioner was removed from the military, not only because of the assault on the officer, but also because he had struck another person on the chest and threatened to strike another person with a torque wrench extension bar. Ms.

15

Cajulao also acknowledged that the petitioner, while on military duty, had assaulted a roommate with a deadly weapon.

The petitioner contends that if his trial counsel had spent more time with the witness, his negative military history could have been avoided. At the post-conviction hearing, Attorney Parsons recalled wishing that he had more time to meet with the witness. He testified that his strategy at trial was to humanize the petitioner by calling sympathetic witnesses. He was aware of the state's opportunity to rebut any positive testimony about the petitioner and conceded that his only other option would have been to present no mitigating evidence at all.

Attorney Richardson testified that "[t]here were certain witnesses that we had to face a problem of them bringing up the problems that he had in the Navy." He realized that the cross-examination of Ms. Cajulao might be risky but "didn't realize we would have it to the extent that it ended up we had ...."

In our view, defense counsel's awareness of the possible dangers inherent in the cross-examination and their decision to present her positive testimony anyway was a classic tactical decision. Because the strategy was based upon adequate preparation, this court must not second guess. In reviewing counsel's conduct, a "fair assessment ... requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. In our view, trial counsel had little choice but to present as much mitigating evidence as possible even though there were risks inherent in that strategy.

16

Moreover, there is nothing in the record to suggest that additional preparation time with the witness could have prevented the state from effectively cross-examining her.  If Ms. Cajulao were to testify at all to the petitioner's prior military background, the state would be entitled to rebut that testimony.  In summary, we cannot hold that the evidence preponderated against the finding of the trial court that trial counsel had performed effectively.

(f)

The petitioner also argues that trial counsel was ineffective by opening the door to damaging evidence at the penalty phase.  First, the petitioner claims they questioned state witness Frank Floied "in such a fashion as to allow [him] to comment that shortly after the killing the [p]etitioner appeared 'cool' and acted as if the killing was nothing."  At the guilt phase of the trial, Floied testified that he spoke directly with the petitioner on the telephone the evening after the arrest.  On cross-examination, Attorney Richardson asked, "Did he appear to be motivated in attempting to tell you where the body was ...?"  Floied responded that "he was the most cool and direct person that I've ever talked to in this situation....  I had some disbelief that he could have done it--that anyone could have done it and described it in that detail as if it was nothing."  The record shows that Floied's answer to the question was not responsive to the question asked.  Perhaps trial counsel should have objected and sought curative instructions.  Yet the petitioner has again failed to establish any prejudice.  Officer Roy Phillips of the Tennessee Highway Patrol testified that he gave the petitioner a speeding ticket only hours after the murder occurred.  He described the petitioner as "cool, calm, and collected....  [Y]ou'd think he had just come from church the night I stopped him ...."  Thus Floied's remark, while probative as to the element of deliberation, was cumulative and may have been admissible anyway had the state asked about the petitioner's demeanor.  In

any event, we find no constitutionally deficient representation in this regard.

The petitioner also complains that the trial counsel opened the door to devastating evidence by asking Dr. Copple about his good qualities. He points out that the state was then able to present damaging evidence in rebuttal. Prior to trial, a competency evaluation by MTMHI suggested the petitioner was a malingerer and showed no remorse. The records there showed the petitioner was somewhat violent and disruptive while at the facility. MTMHI classified the petitioner as having adult antisocial behavior.

Attorney Richardson admitted, "I frankly did not know that ... the [s]tate could use information given by the defendant to a psychiatrist." Attorney Parsons testified that their strategy was to emphasize positive attributes of the petitioner and show the jury that he could lead a productive life in prison. Dr. Copple's testimony played a key role in this strategy. Although both trial attorneys apparently were surprised by the fact that the state could use the information acquired by MTMHI, Attorney Parsons did acknowledge that he knew that positive testimony by Dr. Copple would open the door for the state to present negative information.

Again, the petitioner has failed to establish any prejudice by whatever deficiency there may have been in the performance of counsel. The evidence does not preponderate against the finding that the sentence would have been different if the attorneys had known the information collected by MTMHI would have been admissible. In our view, trial counsel had little choice other than to call Dr. Copple in an effort to establish adequate mitigating circumstances. Even if there had been proof that trial counsel should have pursued a different strategy, there has been no indication that another strategy would have been more effective. Because the jury

18

found three aggravators, we cannot conclude that the outcome would have been any different if the jury had not heard the evidence concerning the testing by MTMHI. If any witness testified to the petitioner's good character, the state would have been entitled to rebuttal. The only other option would have been to present no proof at all. As Attorney Richardson noted, the petitioner had a relatively productive background; the failure to present some evidence of his prior good behavior might have qualified as ineffective assistance.

(g)

The petitioner next submits that his counsel was ineffective by allowing a deposition to be used rather than requiring state witness Dr. Robert Glenn Watson to appear at the penalty phase of the trial. The petitioner attended the deposition; Dr. Watson was cross-examined by trial counsel. At the sentencing phase, the deposition, including cross-examination, was read into evidence.

Dr. Watson testified that the petitioner's intelligence quotient was in the lower average range. There was no real evidence of brain damage. He believed that the petitioner had malingered on one test which indicated schizophrenia. He found that the petitioner was untruthful in claiming he could not read. He testified that the petitioner had a good self-concept and tried to portray himself in a positive manner, but had some behavioral problems while at MTMHI. He recalled that the petitioner had tripped one patient and had started a fight. Diagnosed as having adult antisocial behavior, the petitioner showed very little or no emotion or expressions of empathy when talking about the murder. Dr. Watson observed no evidence of remorse.

The petitioner argues his counsel was ineffective for waiving his right to confront the witness at trial and for failing to comply with Tenn. R. Crim. P. 15. We need not address whether counsel was deficient by agreeing to the deposition because it is apparent the petitioner cannot show he was prejudiced by the use of the deposition. See Goad, 938 S.W.2d at 370 (a reviewing court need not assess whether counsel's conduct was deficient if no prejudice can be found).

In Edward Samuel L. Foy, Jr., v. State, No. 03C01-9212-CR-00414 (Tenn. Crim. App., at Knoxville, Sept. 28, 1993), a similar issue was raised. There,

20

the deposition was taken outside the petitioner's presence; the petitioner argued his counsel was ineffective for failing to comply with Rule 15 in taking a deposition. Id., slip op. at 6. The petitioner complained that "'[w]here petitioner's own counsel violated [his] Sixth Amendment right to confrontation ..., counsel's performance was obviously ineffective and deficient.'" Id. (alteration and omission in original). Our court ruled that it was purely conjecture to suggest "that the jury would have ruled for acquittal had the deposition testimony been excluded." Id.

We conclude any claim of prejudice in this case would also qualify as mere speculation. In fact, the decision to use a deposition instead of live testimony may have inured to the benefit of the petitioner. If Dr. Watson had appeared in person at the trial, there is at least the possibility that his stature or demeanor might have tended to accredit his testimony. An impressive witness is a persuasive witness. The reading of the deposition into evidence might have been less effective for the state. The petitioner has not carried his burden of establishing that but for the deposition testimony, the outcome of the sentencing hearing would have been different.

(h)

The petitioner also argues that his counsel was ineffective for failing to question the assistant district attorney at the motion for new trial about racist remarks; he contends the information would have been useful in establishing a Batson violation. During jury selection, only one African-American, Alonzo Walker, was examined as a prospective juror. The state peremptorily challenged that individual. At the post-conviction hearing, Attorney Parsons testified that some time after voir dire but before the motion for new trial, he had a conversation with the assistant district attorney, who purportedly stated, "I hope they fry that nigger." One

21

of the grounds raised in the motion for new trial was whether the trial court erred by refusing to enjoin the state from using peremptory challenges to exclude any African-Americans. At the hearing on the motion for new trial, the assistant district attorney explained that he peremptorily challenged Walker, not due to his race, but because he was not strongly in favor of the death penalty. No questions were asked about the racist comment.

At the post-conviction hearing, Attorney Parsons testified that he was upset by the assistant district attorney's remark. Attorney Richardson, who was not present at the time the comment was made, did recall that Attorney Parsons was upset about the conversation. The assistant district attorney flatly denied having made the remark.

In the order denying post-conviction relief, the trial judge accredited the testimony of the assistant district attorney and found that the racist comment had not, in fact, been made. Findings of fact made by the trial judge are conclusive on appeal unless the evidence preponderates against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The trial judge who sees and hears the witnesses is generally in a better position than this court to assess credibility. The record in this case does not preponderate against the trial judge's finding. Thus, our scope of review is limited. Because the petitioner has failed to meet his burden of proving that the racist remark had been made, trial counsel could not have been ineffective by failing to cross-examine. This issue is, therefore, without merit.

(i)

Finally, the petitioner insists that his trial counsel was ineffective for

22

failing to object to comments by the state upon his failure to testify. During closing

argument, the state argued that no defense to the crime had been offered. The

petitioner contends that his trial attorneys should have objected to this argument.

The law clearly prohibits any prosecutorial comment upon the

accused's election not to testify. Griffin v. California, 380 U.S. 609 (1965). To do so

constitutes misconduct. Id. at 615. After a careful review of the trial record,

however, we conclude that the argument did not qualify as a comment upon the

petitioner's failure to testify. In our view, comments by the state were a reasonable

assessment of the evidence. In State v. Blackmon, 701 S.W.2d 228, 233 (Tenn.

Crim. App. 1985), the state argued there had been no "excuse or justification"

offered for the offense. Our court ruled that the "comments [were] in the nature of

arguments that the State's proof is uncontradicted .... Our Courts have held that

arguments of this type are not improper comments on the defendant's exercise of

his right not to testify." Id. That ruling controls the disposition of the case. Because

the argument was not improper, there was no ineffective assistance in failing to

object.

II

The petitioner next argues the trial court erred by denying funds for the

employment of a psychologist, psychiatrist, or an investigator to help prepare for the

post-conviction hearing. Tenn. Code Ann. § 40-14-207(b) provides for state funding

of expert services in capital cases:

> In capital cases where the defendant has been found to
> be indigent by the court of record having jurisdiction of
> the case, such court in an ex parte hearing may in its
> discretion determine that investigative or expert services
> or other similar services are necessary to ensure that the
> constitutional rights of the defendant are properly
> protected.

23

In Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995), our supreme court ruled that the statute also "applies to post-conviction capital cases." The Owens court also provided guidelines on how to request the services and when the trial court should grant the services:

> To obtain an ex parte hearing, a capital post-conviction petitioner must submit a written motion to the trial court, alleging why under the particular facts and circumstances of the case, investigative or expert services are necessary to ensure the protection of the petitioner's constitutional rights. A bare allegation that support services are needed is not sufficient. In addition, the motion must include: (a) the name of the proposed expert or service; (b) how, when and where the examination is to be conducted or the services are to be performed; (c) the cost of the evaluation and report thereof; and (d) the cost of any other necessary services, such as court appearances. Tenn. Sup. Ct. Rule 13, § 2(B)(10). Once the petitioner satisfies these threshold procedural requirements, the trial court must conduct an ex parte hearing on the motion.

Owens, 908 S.W.2d at 928.

In Owens, the court ruled that the motion should be granted if the proof at the hearing shows the services are necessary to protect the petitioner's constitutional rights. Id. The Owens court also noted the statute "vests with the trial court discretion to determine if investigative or expert services are necessary to ensure that the movant's constitutional rights are protected." Id. at 929.

As a preliminary matter, the state argues that the petitioner is not entitled to the benefit of the Owens decision because the opinion was released after the petitioner's original motion was filed. The state contends the petitioner's motion should be reviewed under Teague v. State, 772 S.W.2d 915, 927 (Tenn. Crim. App. 1988), where our court held a statutory right to investigative or expert services only applied at trial. On certain other issues, our supreme court has decided that the new rule would apply to all cases in the "pipeline ... to all actions pending on the

24

date this decision is announced, and to all causes of action arising subsequently." State v. McClintock, 732 S.W.2d 268, 274 (Tenn. 1987). This court has previously applied the "pipeline approach" to this very issue. Michael Eugene Sample v. State, No. 02C01-9505-CR-00131, slip op. at 24 (Tenn. Crim. App., at Jackson, Sept. 30, 1996), app. denied, (Tenn., Jan. 1, 1997). In Sample, our court held that the request for services was made before Owens was released; the panel nevertheless used the standards adopted in Owens to determine whether the trial court erred by denying the services. Id. We will attempt to do so here as well.

On February 1, 1991, the petitioner filed an ex parte, sealed motion seeking funds to pay for a psychologist and investigator. The motion alleged that funding was necessary to establish the following:

> (1) whether trial counsel was ineffective for failing to present proof of the defendant's impaired mental condition at the time of the offense as mitigating evidence;
>
> (2) whether trial counsel was ineffective for failing to investigate the petitioner's head injuries;
>
> (3) whether the petitioner was mentally competent to give a confession or knowingly waive his right to counsel;
>
> (4) whether the petitioner was mentally competent to stand trial; and
>
> (5) whether the petitioner is competent to be executed.

The motion was supported by an affidavit of Dr. Gillian Blair, a licensed psychologist. Dr. Blair's affidavit included information about the cost of her services and documented her review of the petitioner's post-incarceration medical records, which indicated that the petitioner had suffered from "escalating psychiatric problems." Because the petitioner had been diagnosed as having a bipolar affective disorder, a schizo-affective disorder, or schizophrenia paranoid type, and was taking lithium, haldol, and cogentin, it was Dr. Blair's opinion "that some degree of such

impairment [likely] would have existed at the time of the offense and ... would ... have been significant mitigating evidence ...."

Brock Mehler, who had experience in investigation and in the development of mitigating circumstances in capital cases, also submitted an affidavit estimating the cost of investigative services. The document sought a detailed investigation into the petitioner's history so that a determination could be made of the effectiveness of trial counsel in his presentation of mitigating circumstances.

The motion requesting an ex parte hearing was denied. Judge Gerald Ewell did, however, indicate he would allow a hearing in open court on the matter. The petitioner filed a motion for reconsideration on the ex parte aspect of the motion, which was also denied. After an open hearing, the trial court denied the motion for funds. Permission for an interlocutory appeal was denied.

Judge Ewell subsequently recused himself from the case and the petitioner renewed his motion for expert funds before his replacement, Judge Buddy Perry. The petitioner relied on the previous motion filed as well as the memorandum and applications filed seeking interlocutory appeal. Judge Perry entered an order staying the matter pending the release of this court's opinion in the Owens case. See Gaile K. Owens v. State, No. 02C01-9111-CR-00259 (Tenn. Crim. App., at Jackson, March 25, 1994), rev'd in part, 908 S.W.2d 923 (Tenn. 1995).

Later, Judge William Russell was designated to hear the case. Again, the petitioner attempted to renew his motion for an ex parte hearing for consideration of his request. An updated version of Dr. Blair's affidavit was filed.

26

Judge Russell denied the request:[1]

> Petitioner has renewed his motion for State funds to employ a licensed psychologist or psychiatrist to assist in the preparation of this case for post-conviction relief. Funds are also sought for an investigator. Such funds may only be made available when there is a demonstrated need. The issue of the petitioner's mental competency was thoroughly litigated upon his trial. The Court finds that there has been no demonstrated need for the funds requested, and the motion is again denied.

A motion to reconsider contended that the expert assistance was necessary to establish the ineffectiveness of trial counsel for failing to investigate (1) the petitioner's mental state at trial and when he gave his confession and (2) the effect of his head injuries. In a pre-trial hearing, Judge Russell stated, "[t]he one issue that is basically new and will require some expertise on is the matter of his present mental health." At that point, the petitioner discussed the motion to reconsider the request for expert services. The trial court, ruling that "the matter of funding now is not necessary to get her testimony," found that Dr. Blair had already performed an evaluation and could be subpoenaed to testify. When the petitioner argued that Dr. Blair's opinions were preliminary and that more testing was necessary, the trial court denied further delay: "In other words, and I'm not condemning you gentlemen, but if this man has been demented for months or years, that should have been brought before the Court long before now." When the petitioner argued that Dr. Blair's testimony was needed to establish whether trial counsel was ineffective for failing to present evidence of his head injuries, Judge Russell agreed to hear proof on that saying, "Let's put it this way. If she goes ahead and there is something more than a delaying tactic, I will reconsider."

---

[1] It is unclear from the record whether the petitioner filed a new motion for reconsideration after Judge Russell was appointed or whether Judge Russell was acting on the motion taken under advisement by Judge Perry. All that is in the record is Dr. Blair's affidavit.

27

Later, the trial court entered an order providing as follows:

> The petition[er]'s motion to reconsider the Court's previous denial of pre-trial funds for investigators and experts is overruled.
>
> The State is ordered to make the petitioner available immediately for mental status testing by Dr. Gillian Blair. The results of Dr. Blair's tests will be made available to the District Attorney General, and the reports of any tests hereafter done by the State relative to the petitioner's present mental state shall be shared with petitioner's counsel.

The petitioner again filed a request for funds, contending that Dr. Blair could not perform additional services without compensation and that she had never been compensated for any of the services rendered. The trial court ruled that no compensation beyond a witness fee was warranted and observed that the state medical records could be obtained by subpoena for the post-conviction hearing.

Now, the petitioner argues that he was denied his right to due process by the trial court's failure to authorize the funds for a psychologist or psychiatrist and an investigator. He contends the original order denying services was rendered void when Judge Ewell recused himself. The petitioner insists that the services were necessary to establish the ineffectiveness of trial counsel by failing to pursue and present significant mitigating evidence.

This court may not review this issue. The transcript of the hearing on the motion for expert services conducted in front of Judge Ewell is not included in the record on appeal. Owens clearly contemplates a presentation of proof: "The trial court should grant the motion if, at the hearing, the petitioner demonstrates that investigative or expert services are necessary to ensure the protection of the petitioner's constitutional rights." Owens, 908 S.W.2d at 928. Without a record of

28

the hearing, this court cannot determine whether Judge Ewell erred by denying the motion.  See Edward Jerome Harbison, No. 03C01-9204-CR-00125, slip op. at 17 (Tenn. Crim. App., at Knoxville, May 20, 1996), app. denied, (Tenn., Nov. 12, 1996).

The petitioner also argues Judge Ewell's order is void because he recused himself.  In support of his contention, he filed as supplemental authority Bolling v. Anderson, 63 Tenn. 550, 552 (1902), where our supreme court ruled that a decree entered by an incompetent chancellor "fails, and with it all subsequent proceedings based upon it."  We disagree.  The post-conviction statute contemplates that the trial judge shall preside at the post-conviction hearing, if available:

> If a petition filed pursuant to this chapter raises the issue of the competency of counsel representing the petitioner, at either the original trial proceeding or an appellate proceeding reviewing such original proceeding, such petition shall be heard and determined by the trial judge who presided at the trial in which the conviction occurred ....

Tenn. Code Ann. § 40-30-103(b)(1) (repealed 1995).  In this case, however, the petitioner filed a motion to disqualify Judge Ewell on the grounds that he could not be partial at the evidentiary hearing because he had already expressed the opinion that petitioner's trial attorneys gave petitioner a vigorous and thorough defense.  In the Rule 12 report on the trial, Judge Ewell observed that the attorneys "afforded the defendant as vigorous and thorough defense as [he] has observed in a lifetime of exposure to the legal system."  In his request for the designation of a replacement judge, Judge Ewell explained his recusal as due to "compelling circumstances."  At the post-conviction hearing, Judge Ewell testified that, in his opinion, the petitioner's trial counsel performed excellently.

Judge Ewell may have been qualified to hear the motion for services.

29

In our view, he recused himself out of his desire to assure the petitioner the perception of a neutral arbiter, absent any personal bias as to his claims; however, even if Judge Ewell believed trial counsel had performed within acceptable standards of the profession, the petitioner waived any complaint about his competency to hear the motion. The petitioner knew about the potential bias well in advance of the motion and chose to ask for relief from Judge Ewell anyway. In Holmes v. Eason, 76 Tenn. 754 (1882), our supreme court noted that the right to an impartial judge may be waived where there is no timely objection:

> For otherwise the parties would be allowed to experiment with the court by tacit acquiescence, and raise the objection when the result of the trial proved to be unfavorable.

> ***

> And, generally, if the facts are known to the party recusing, he is bound to make his objection before issue joined, and before the trial is commenced, otherwise he will be deemed to have waived the objection .... If the objection be raised of record, and the court undertake to proceed notwithstanding, the judgment might be held void under these principles .... But if no objection be made, and the court is permitted to go to a trial of the case on the merits, the judgment is clearly not void on its face, and something more than the mere existence of the fact on which the incompetency rests should be required to authorize a resort to another tribunal.

Id. at 757, 761. This principal was affirmed more recently by our court. In Grant v. State, 542 S.W.2d 626, 627 (Tenn. Crim. App. 1975), the petitioner had argued his post-conviction judge "should not have heard this proceeding because he had heard the early habeas corpus petition." There, counsel at the post-conviction hearing had commented on the conflict but stated, "we can continue as you will." Id. On appeal, this court ruled that the petitioner "acquiesced in Judge Hinson hearing the case." Id. Also, in Woodson v. State, 608 S.W.2d 591, 593 (Tenn. Crim. App. 1980), our court ruled "that the petitioner's failure to raise the issue prior to trial amounted to a waiver of his right to question the trial judge's qualifications to hear the case ...."

30

See also <u>James J. Benson v. State</u>, No. 01C01-9401-CC-00026 (Tenn. Crim. App., at Nashville, Nov. 8, 1996), <u>app. granted</u>, (Tenn., April 14, 1997) (quoting with approval the principles stated in <u>Holmes</u>, 76 Tenn. at 757, 761).

The same logic applies here. The recusal issue should have been raised before the hearing. Judge Ewell's order was not rendered void by his subsequent recusal. Moreover, without the transcript of the hearing before Judge Ewell, we cannot conclude there was an abuse of discretion in denying the services. It is the burden of the appellant to prepare a record on appeal that presents a complete and accurate account of what transpired in the trial court with respect to the issue on appeal. Tenn. R. App. P. 24(b). The failure to do so results in a waiver of such issues and a presumption that the ruling of the trial court was correct. <u>See</u>, e.g., <u>State v. Oody</u>, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); <u>State v. Draper</u>, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). On the record before us, we cannot conclude the trial court abused its discretion by denying the services.

III

Next, the petitioner argues the trial court erred by refusing to set aside the designation order by our supreme court and by refusing to reinstate Judge Buddy D. Perry. After Judge Perry entered an order staying all proceedings until the Court of Criminal Appeals released its opinion in <u>Owens</u>, the supreme court entered an order specially designating Judge William Russell to hear the matter. Later, the petitioner filed a motion requesting that the supreme court's order be "recalled." That order was denied. A similar motion by the petitioner filed with the supreme court was denied.

In its order designating Judge Russell to hear the matter, the supreme

court cited Tenn. Code Ann. § 16-3-212, which provides, in part, as follows:

> **Special personnel for expedition of post-conviction proceedings in capital cases.**--The supreme court is authorized to employ, reassign, or contract with individuals utilizing special funds appropriated solely for the purpose of providing prompt and fair adjudication of post-conviction proceedings in capital sentence cases, including authority to assign the additional personnel the duties of personnel reassigned to the post-conviction cases.

The petitioner argues that the section cannot be construed to allow the supreme court to remove judges without cause. First, he argues that such an interpretation violates Tenn. Sup. Ct. R. 11 (III)(d), which places responsibility for reducing docket delays on the presiding judge of each judicial district. Next, he insists that such an interpretation violates Article VI, Section 11 of the Tennessee Constitution, providing for the appointment of special judges in limited situations. Finally, he contends that such an interpretation violates Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution.

This court is bound by the decisions of our supreme court. Our court may only review the "final judgments of trial courts." Tenn. Code Ann. § 16-5-108(a). Our court does not have the jurisdiction to review the propriety of an order by our supreme court. "'[I]t is a controlling principle that inferior courts must abide the orders, decrees and precedents of higher courts. The slightest deviation from this rigid rule would disrupt and destroy the sanctity of the judicial process.'" State v. Irick, 906 S.W.2d 440, 443 (Tenn. 1995) (quoting Barger v. Brock, 535 S.W.2d 337, 341 (Tenn. 1976)). See also Bloodworth v. Stuart, 428 S.W.2d 786 (Tenn. 1968). Accordingly, we may neither modify nor rescind the order of the supreme court designating Judge Russell to hear the case.

IV

The petitioner next argues that the opinion in State v. Brown, 836 S.W.2d 530 (Tenn. 1992), should be retroactively applied to his case, thereby rendering the jury instructions at trial erroneous. In Brown, our supreme court ruled that, because of potential juror confusion, trial courts should no longer instruct the jury that the premeditation required to sustain a conviction for first degree murder can be "formed in an instant." The trial in this case was conducted before the ruling in Brown; thus, the petitioner would not be entitled to relief unless the holding had retroactive application.

This court has repeatedly held that Brown did not announce a new constitutional principle. Retroactive application is not permissible. See, e.g., Lofton v. State, 898 S.W.2d 246, 250 (Tenn. Crim. App. 1994) (citing three unpublished cases holding Brown does not apply retroactively). Accordingly, erroneous jury instructions under Brown could not qualify as a basis for post-conviction relief.

V, VI, VII, & VIII

Issues five, six, seven, and eight may be considered together. They are as follows:

> (V) whether the jury instructions on the "heinous, atrocious or cruel" aggravating circumstance were unconstitutionally vague;
>
> (VI) whether the petitioner's confession was unlawfully obtained and illegally admitted at his trial;
>
> (VII) whether the failure of the trial court to instruct the jury on the effect of non-unanimity and the option to recommend life imprisonment violated the petitioner's rights under the Eighth and Fourteenth Amendments; and
>
> (VIII) whether the trial court's allowing Dr. Watson to testify and introduce psychiatric/psychological reports through his testimony was an unconstitutional denial of the petitioner's rights.

33

In each instance, our supreme court previously determined the issue on direct appeal. Thompson, 768 S.W.2d at 248, 251, 252. "A ground for relief is 'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." Tenn. Code Ann. § 40-30-112(a) (repealed 1995). A "full and fair hearing" occurs if the "petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief." House v. State, 911 S.W.2d 705, 714 (Tenn. 1996) (footnote omitted), cert. denied, 116 S.Ct. 1685 (1996).

The petitioner's fifth issue, that the jury instructions on the "heinous, atrocious or cruel" aggravating circumstance were unconstitutionally vague has been considered and rejected by our supreme court. On direct appeal, the petitioner contended that the aggravator was "unconstitutionally vague under the holding in Maynard v. Cartwright." Thompson, 768 S.W.2d at 252. Our supreme court ruled that "the additional [Williams] instructions give the jury sufficient guidance to prevent arbitrary sentencing." Id. Thus, the issue has been previously determined. See Tenn. Code Ann. § 40-30-112(a) (repealed 1995).

In State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985), our supreme court defined the "heinous, atrocious and cruel" aggravator in such a way as to narrow its application and meet constitutional standards. The petitioner concedes that these definitions comply with the requirements of Williams; he argues, however, that subsequent cases, primarily federal cases, have found the instructions given to be unconstitutionally vague. In Rickman v. Dutton, 854 F. Supp. 1305 (M.D. Tenn. 1994), a federal district court did indeed rule that the jury instructions on this particular aggravating circumstance were erroneous. The ruling in Rickman, however, does not bind this court. The United States Supreme Court is the only federal court Tennessee courts are bound to follow. See State v. McKay, 680

34

S.W.2d 447, 450 (Tenn. 1984); State v. Bowers, 673 S.W.2d 887, 889 (Tenn. Crim. App. 1984). Thus, the issue is without merit.

The petitioner's sixth issue is that his confession was unlawfully obtained and illegally admitted at his trial. The petitioner admits that he unsuccessfully contested the admission of his confession on direct appeal. See Thompson, 768 S.W.2d at 247-48. On direct appeal, the petitioner cited a "violation of his fifth amendment right to counsel during custodial interrogation." Id. at 247. He insisted that an invocation of his right to remain silent was not honored. Our supreme court agreed that when an accused invokes the right to remain silent, all questioning must cease. Id. Yet the supreme court ruled the right may be subsequently waived if the accused initiates further contact with police. Id. This record demonstrates that the petitioner reinitiated contact with the police and "voluntarily relinquished" his rights to counsel and to remain silent. Id. Our supreme court so held. Id.

The petitioner claims, however, that he is entitled to a review of the admissibility of his statement under the standards enunciated in State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992). In Crump, our supreme court held that the admissibility of statements obtained after a person in custody has decided to remain silent depends on whether his right to cut off questioning was "scrupulously honored." Id.

Post-conviction relief may be granted when a conviction is "void or voidable because of the abridgement ... of any [constitutional] right ... including a right that was not recognized as existing at the time of trial if either constitution requires retrospective application of that right." Tenn. Code Ann. § 40-30-105

35

(repealed 1995). By this argument, the petitioner implies that Crump created a "right that was not recognized as existing at the time of trial." There must be retroactive application "when the new state rule enhances the integrity and reliability of the fact finding process of the trial." Meadows v. State, 849 S.W.2d 748, 754 (Tenn. 1993).

After Crump was arrested and provided Miranda warnings, he invoked his right to remain silent. Crump, 834 S.W.2d at 266. Notwithstanding his assertion that he did not wish to talk to police, the officers arranged to take Crump on a ride through the crime scene area in the hope of learning more about the crime. Id. at 267. Crump did, in fact, make some incriminating statements and later gave a full confession. Id. Our supreme court concluded that the police conduct in taking Crump on the ride "amounted to a violation of the defendant's state and federal constitutional rights." Id. at 270. Our supreme court also determined that the subsequent confession given was inadmissible, even though it was made after Crump had been given Miranda warnings. Id. at 271. In Crump our supreme court relied on State v. Smith, 834 S.W.2d 915 (Tenn. 1992), a companion case released the same day, to determine that the confession was inadmissible. In Smith, it was held that under the Tennessee Constitution the "extraction of an illegal, unwarned confession from a defendant raises a rebuttable presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality," but that presumption may be overcome by the state if the state can show the "'taint is so attenuated as to justify admission of the subsequent confession.'" Id. at 919 (quoting in part Oregon v. Elstad, 470 U.S. 298, 335 (1985) (Brennan, J., dissenting)).

The Crump decision encompasses two separate holdings: first, that

36

once an accused asserts his right to remain silent, the state must scrupulously honor that right or run the risk that any statement acquired be excluded in some circumstances; and second, relying on Smith, where an initial illegal confession is tainted, the subsequent confession will be presumed illegal. That portion of Crump, which holds that when an accused invokes his fifth amendment right it must be honored, does apply to the petitioner in this case. Yet that portion of Crump is not new law. In fact, the same law was applied in the direct appeal of this case. See Thompson, 768 S.W.2d at 747. Thus, a Meadows analysis is unnecessary. This issue has been previously determined adversely to the petitioner and cannot be the basis for post-conviction relief.[2]

The petitioner's seventh issue involving challenges to certain jury instructions at the penalty phase has been previously determined. First, he argues that the instructions required the jury to find mitigating circumstances only if there was unanimous agreement on their existence; he contends that the charge violated the ruling in Mills v. Maryland, 486 U.S. 367 (1988). The petitioner also complains that the jury was not instructed that if they failed to agree on a sentence, a life sentence would automatically be imposed. Finally, the petitioner complains as erroneous instructions that if aggravating circumstances had been proved, such circumstances must be outweighed by "sufficiently substantial" mitigating circumstances before a life sentence may be imposed; the petitioner admits this issue was reviewed on direct appeal, but submits the supreme court "misse[d] the point."

---

[2]We make no findings as to whether the Smith holding on the presumed illegality of a subsequent confession following an initial illegal confession is a new constitutional law to be applied retrospectively, as that determination is not necessary to resolve this issue. "[C]ourts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).

On direct appeal, the petitioner argued "that the jury in this case was required to agree unanimously on the existence of mitigating circumstances, and thereby one or more jurors might have been precluded from considering evidence he or she deemed mitigating in the ultimate determination." Thompson, 768 S.W.2d at 250. The supreme court reviewed the instructions and ruled that they included "none of the objectionable features of the instructions in Mills.... There is no merit to this issue." Id. at 251. Thus, the issue has been previously determined. See Tenn. Code Ann. § 40-30-112(a) (repealed 1995).

The contention that the instructions were erroneous for using the phrase "sufficiently substantial" has also been previously determined. On direct appeal, the petitioner argued that "this phrasing places a burden on the defendant to demonstrate that death is not the appropriate penalty, and that this burden is a denial of due process." Thompson, 768 S.W.2d at 251. In rejecting this claim, our supreme court observed, "[w]e are convinced that in this context, the phrasing does not operate to preclude consideration of any relevant mitigating factors and that it satisfies the constraints of the eighth amendment." Id. at 252. Accordingly, this issue has been previously determined.

The petitioner's eighth issue is that the trial court erred by allowing Dr. Watson to testify. He argues that the testimony was not proper rebuttal evidence. On direct appeal, the petitioner had contended that the trial court erred by admitting Dr. Watson's deposition testimony to rebut the defendant's own expert. Id. at 248. He insisted that the use of this evidence violated the United States Supreme Court's holding in Estelle v. Smith, 451 U.S. 454 (1981), where limitations had been placed on the use of court ordered mental evaluations. Our supreme court ruled that "[a]ll of these limitations were observed in this case.... We find no constitutional error in

38

the admission of Dr. Watson's deposition." Thompson, 768 S.W.2d at 248. Thus, the issue has been previously determined.

## IX & X

Issues nine and ten may also be considered together. They are as follows:

> (IX) whether the petitioner was denied his constitutional right to a trial by jury by the exclusion of two prospective jurors; and

> (X) whether the petitioner's constitutional rights were violated by implicit references to his failure to testify.

Each claim has been waived. We will attempt to explain. The post-conviction statute in effect when the petition was filed defines waiver:

> (b)(1) A ground for relief is waived if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.

> (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

Tenn. Code Ann. § 40-30-112(b) (repealed 1995). Our supreme court has held that "the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief." House, 911 S.W.2d at 714. The court continued, "[w]aiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." Id. Clearly, each claim was available on direct appeal.

The petitioner submits as his ninth issue that his constitutional right to a trial by jury was violated by the unconstitutional exclusion of two prospective jurors by the trial court. The trial court excluded these prospective jurors because of their

39

moral or religious based reluctance to impose the death penalty. The petitioner now argues that such an exclusion violates Article I, Section 4 of the Tennessee Constitution, which provides that no political or religious test shall be required as a qualification for any office of public trust in Tennessee. He also insists that such an exclusion violates Article I, Section 6 which provides that no religious or political test shall ever be required as a qualification for a juror.

This issue was not pursued at trial or on direct appeal. Accordingly, the claim is waived. See House, 911 S.W.2d at 714. Notwithstanding waiver, our courts have rejected the merits of this argument. Our supreme court has held that there is no constitutional violation by excusing jurors whose "views on capital punishment rendered them unable to follow the law as given to them by the court and to perform their duties as jurors in accord with their oaths." State v. Jones, 789 S.W.2d 545, 547 (Tenn. 1990) (quoting State v. Bobo, 727 S.W.2d 945, 949 (Tenn. 1987)).

The petitioner's tenth argument, that his constitutional rights were violated by the repetitive implicit references to his failure to testify, is also procedurally barred. In closing, the state commented on the failure to present a defense:

> There has been no defense presented to first-degree
> murder .... [T]hey [the defense attorneys] have been
> able to see the "handwriting on the wall." They are good
> attorneys, they saw the proof, they knew there was no
> defense, so they have offered no defense to murder in
> the first degree.

There was no objection at the trial and the issue was not raised on direct appeal. By failing to raise the issue on direct appeal, the petitioner has waived it. Tenn. Code Ann. § 40-30-112(b) (repealed 1995); House, 911 S.W.2d at 714. If we were to address the merits of the issue, we would have ruled for the state. As stated

previously, the argument was not improper and was merely an assessment of the evidence presented at trial.  See State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985).

Having found no merit to any of the petitioner's claims for post-conviction relief, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Judge

CONCUR:


_____
Joseph M. Tipton, Judge


_____
William M. Barker, Judge